UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DARCEL FLOWERS and JULIUS WILLIAMS, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>)<br>SOUTHWEST AIRLINES CO. and GLOBE )<br>AIRPORT SECURITY SERVICES, INC., )<br>)<br>Defendants. ) | 1:05-cv-1399-JDT-WTL |

**ENTRY ON PLAINTIFFS' PETITION FOR DETERMINATION OF GOOD FAITH SETTLEMENT (Doc. No. 23) AND DEFENDANT SOUTHWEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 47)**

Noel Flowers suffered from muscular dystrophy, which caused her to be wheelchair bound. She died December 6, 2003, waiting to board a Southwest Airlines Co. ("Southwest") flight at the Indianapolis International Airport. She was twenty-five. Flowers could not hold up her own neck and her parents believe that her death was caused from the position of her head. They filed suit in the Central District of California alleging that Defendant Southwest and Globe Airport Security Services, Inc. ("Globe") did not properly care for Flowers while she was at the airport.

Before the court are a petition for determination of good faith settlement (Doc. No. 23) and a motion for partial summary judgment (Doc. No. 47). Both are essentially choice of law issues for the court. The questions on these motions are: (1) whether Indiana or California law should apply to the issue of joint and several liability; and (2)

whether Indiana's $300,000 limit for damages for loss of love and companionship in this type of wrongful death suit should apply.

**I.     BACKGROUND**

Flowers was from California but was visiting Edward Cyrus in Indianapolis. The two had known each other in California and had dated there. On December 6, 2003, Flowers was to return to California on Southwest Airlines. Cyrus drove Flowers to the Indianapolis International Airport and took her to the Southwest ticket counter. A Southwest employee noticed that Flowers's head was unstable and her eyes were rolling. This employee discreetly asked Cyrus if Flowers was okay and able to fly on her own. Cyrus responded that Flowers was "fine" and that she flew "all the time." He declined an offer from Southwest to escort Flowers to the gate. A Globe employee arrived to wheel Flowers to the Southwest waiting area. Cyrus told the employee that Flowers was not speaking because she was upset about returning to California.

At the Southwest gate, Flowers would not respond to questions. A Southwest representative called Cyrus and asked him to return to the airport. The representative also offered to pay for Cyrus to go with Flowers to California. Cyrus said he would neither accompany Flowers to California nor return to the airport, telling the representative he was on his way to Chicago. Cyrus reiterated that Flowers would refuse to speak to get attention from people. Flowers remained in the Southwest waiting area for approximately ninety minutes before she was found to be unresponsive. It appears that she died in the waiting area.

Plaintiffs—Flowers' parents, Darcel Flowers and Julius Williams—filed a wrongful death suit in United States District Court for the Central District of California on December 3, 2004, against Southwest and Globe.  Cyrus was added as a third-party defendant by Southwest on February 16, 2005.  Defendants filed a motion to transfer to the Southern District of Indiana, which was granted August 1, 2005.  On November 7, 2005, Plaintiffs entered into a settlement agreement with Cyrus for $90,000.

## II.     DISCUSSION

Edward Cyrus filed a "Petition for Determination of Good Faith Settlement" pursuant to California Code of Civil Procedure §§ 877 and 877.6 on January 19, 2006.  For reasons to be discussed below, the court need only rule on that motion if California's law applies with respect to joint and several liability.  Defendant Southwest filed a motion for partial summary judgment on June 6, 2006, asking the court to apply Indiana's Wrongful Death Statute to this case.  Globe moved to join the motion on September 28, 2006.

Because this case was transferred from a California district court pursuant to 28 U.S.C. § 1404, California's choice of law rules apply.  *Int'l Mktg, Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 729 (7th Cir. 1999).  California holds that "in a complex situation involving multistate contacts . . . no single state alone can be deemed to create exclusively governing rights."  *Reich v. Purcell*, 432 P.2d 727, 729 (Cal. 1967).  "The objective . . . is 'to determine the law that most appropriately applies to the issue involved.'"  *Hurtado v. Superior Court*, 522 P.2d 666, 669 (Cal. 1974) (quoting *Reich*,

437 P.2d at 730). California courts have interpreted this to mean that the California conflict of law analysis should be applied to each issue in a case, which can lead to the application of laws from multiple states being applied to different issues in the same case. *Browne v. McDonnell Douglas Corp.*, 504 F. Supp. 514, 517 (N.D. Cal. 1980).

Therefore, the court will give a brief description of California choice of law principles. Following this description the court will analyze the choice of law issue presented by the Petition for Good Faith Settlement. Only if California law is applied will the court decide the merits of the motion. Finally, the court will separately analyze the choice of law issue presented in the Motion for Partial Summary Judgment.

### A.     California Choice of Law Principles

California uses a three-step "governmental interest" analysis in resolving conflict of law problems. *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000). The first step is to examine the law of each potentially interested state and determine if they are different. *Id.*

If the laws differ, the court must determine whether there is a "true conflict"—that is, whether more than one state has an interest in having its law applied. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005-06 (9th Cir. 2001). If only one state has an interest, its law will be applied. For example, in the watershed California case of *Reich v. Purcell*, 432 P.2d 727, Ohio law was applied to a wrongful death suit resulting from an automobile collision which took place in Missouri. Ohio was the only state interested in

applying its law. Plaintiff was from Ohio, Defendant from California. Missouri law would have limited the amount of recovery; however, California and Ohio would not have. Missouri had no interest in applying its law because its only connection was as the place of the injury. Missouri's policy limiting recovery did not concern conduct but rather compensation. From Missouri's prospective, any compensation would have to be paid by a non-resident to a non-resident. "The state of the place of the wrong has little or no interest in such compensation when none of the parties reside there." *Id.* at 731.

If more than one state does have an interest, then there is a "true conflict" and the court must do a "comparative impairment" analysis to determine which state's interest would be more impaired if the other state's law were applied. *Offshore Rental Co. v. Cont'l Oil Co.*, 583 P.2d 721, 726 (Cal. 1978). This comparison is not about "which conflicting law manifest(s) the 'better' or 'worthier' social policy." *Id.* Rather, it is about "the relative commitment of the respective states to the laws involved." *Id.* at 727. In order to make this determination, the court may look to "the history and current state of the states' laws" and "the function and purpose of those laws." *Id.*

### B. Petition for Determination of Good Faith Settlement

California law provides that a court's determination that a good faith settlement has been made releases the settling party from any further liability through a right to contribution otherwise enjoyed by the other tortfeasors. Cal. Civ. Proc. Code § 877.6(c). Edward Cyrus seeks such a determination in this case. A preliminary matter to the Petition for Determination of Good Faith Settlement in this case, however, is a

choice of law question.  A determination of good faith is necessary only if tortfeasors are jointly liable for economic damages pursuant to California law.  Because a settlement in good faith extinguishes the right to contribution in California, if a defendant settles with the plaintiff there is a chance that the remaining defendants will be forced to pay more than their fair shares of economic damages even though the settling defendant could have paid his share.  Under Indiana law, a tortfeasor cannot be liable for more than its pro-rata share of damages regardless of whether another tortfeasor settles.  Therefore, there only needs to be a determination of good faith if California's choice of law applies with respect to joint liability for economic damages.

Under California law, non-economic damages[1] are several.  Cal. Civ. Code § 1431.2(a).  Therefore, a party can only be liable for non-economic damages in proportion to his or her degree of fault.  *Id.*  Economic damages, however, are joint and several.  *See* Cal. Civ. Code § 1431.  A joint-tortfeasor can be liable for all economic damages even though he or she is only partially at fault, although he can usually seek

---

[1] Under California law, economic damages are defined as:

> objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.

Cal. Civ. Code § 1431.2(b)(1).  Non-economic damages are defined as:

> subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.

Cal Civ. Code § 1431.2(b)(2).

contribution from the other tortfeasors for their pro-rata shares.  *See* Cal Civ. Proc. Code § 875.

However, the California Code of Civil Procedure provides that settling with a tortfeasor eliminates the other tortfeasors' rights to contribution:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater.
>
> (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties.

Cal. Civil Proc. Code § 877.  The Code further provides that "[a] determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."  Cal. Civil Proc. Code § 877.6(c).

To summarize California law: A joint tortfeasor can settle with a plaintiff for less than what would otherwise be his proportionate share of damages.  If a court determines that this settlement was made in good faith, the other tortfeasors—if found liable—could be forced to pay a greater amount of the economic damages than their proportionate share of fault might otherwise require.  However, the amount of damages

recoverable from these remaining tortfeasors is reduced by the settlement amount to avoid double payment to the plaintiff.

Indiana does not make California's distinction between economic and non-economic damages for the purposes of joint and several liability. In Indiana, damages are apportioned among the parties in proportion to their fault regardless of the type of damages. Ind. Code § 34-51-2-8(b).[2] A tortfeasor cannot be held liable for more than his or her proportionate amount based on fault. Therefore, there is no right to

---

[2] Ind. Code § 34-51-2-8(b) states:

The court, unless all the parties agree otherwise, shall instruct the jury to determine its verdict in the following manner:

(1) The jury shall determine the percentage of fault of the claimant, of the defendants, and of any person who is a nonparty. The jury may not be informed of any immunity defense that might be available to a nonparty. In assessing percentage of fault, the jury shall consider the fault of all persons who caused or contributed to cause the alleged injury, death, or damage to property, tangible or intangible, regardless of whether the person was or could have been named as a party. The percentage of fault of parties to the action may total less than one hundred percent (100%) if the jury finds that fault contributing to cause the claimant's loss has also come from a nonparty or nonparties.

(2) If the percentage of fault of the claimant is greater than fifty percent (50%) of the total fault involved in the incident which caused the claimant's death, injury, or property damage, the jury shall return a verdict for the defendants and no further deliberation of the jury is required.

(3) If the percentage of fault of the claimant is not greater than fifty percent (50%) of the total fault, the jury shall then determine the total amount of damages the claimant would be entitled to recover if contributory fault were disregarded.

(4) The jury next shall multiply the percentage of fault of each defendant by the amount of damages determined under subdivision (3) and shall enter a verdict against each defendant (and such other defendants as are liable with the defendant by reason of their relationship to a defendant) in the amount of the product of the multiplication of each defendant's percentage of fault times the amount of damages as determined under subdivision (3).

contribution in Indiana. Ind. Code § 34-51-2-12.[3] The Defendants, then would not have to worry about Plaintiffs' settlement with Mr. Cyrus since it would not affect their potential liability.

The conflict in this case is simple to state: should California's regime of joint and several liability for economic damages apply or should Indiana's regime of comparative fault? However, it is not as simple to resolve—it is a true conflict. California has a legitimate interest in improving the odds that its citizens get compensated for torts committed against them, even if the injury took place in Indiana. *See Offshore Rental*, 583 P.2d at 725 ("California's policy of protection extends beyond such an injury inflicted within California, since California's economy and tax revenues are affected regardless of the situs of the physical injury."). Indiana has a legitimate interest in limiting damages from actions within its borders to each parties' relative fault. *Cf. Koziol v. Vojvoda*, 662 N.E.2d 985, 988 (Ind. Ct. App. 1996) (Indiana's Comparative Fault Act "reflects a legislative determination that fairness can be best achieved by a relative assessment of the parties' respective conduct").

---

[3] Both Defendants claim they are entitled to indemnity from Mr. Cyrus. But in Indiana, indemnity can only be sought when a third party's "wrongful act caused derivative or constructive liability to be imposed upon the indemnitee." *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 576 (Ind. Ct. App. 2003). "Indiana adheres to the general rule that in the absence of an express contractual or statutory right to indemnity, a party may bring an action for common law indemnification only if he is without fault." *Id.* at 575. It appears that what Defendants really want from Mr. Cyrus is contribution in the event that they are held liable, but again this is not available to them under Indiana law. Further, it would be unnecessary under Indiana law because Southwest or Globe could not be liable for more than their pro-rata shares of the damages anyway.

Because the commitment of both states to their respective policy is high, this true conflict is especially difficult to decide.  These policies are modern compromises made in deliberate departure from the common law rule of contributory negligence.  Under the common law, a plaintiff could be prohibited from collecting against a tortfeasor if the plaintiff was even slightly negligent himself.  Also, a tortfeasor could be liable to plaintiff for every penny of plaintiff's damages even though another tortfeasor was much more at fault.

California has moved away from traditional joint and several liability; however, in a narrow category it has steadfastly maintained it.  The shift away from the common law began in *Li v. Yellow Cab Co.*, 532 P.2d 1226 (Cal. 1975), where California abandoned the harshness of this "all-or-nothing" contributory negligence standard and declared: "the contributory negligence of the person injured . . . shall not bar recovery, but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." *Id.* at 1243.

In *American Motorcycle Association v. Superior Court*, 578 P.2d 899 (Cal. 1978), the California Supreme Court decided that the implementation of a comparative fault system did not dictate moving away from joint and several liability.  In the decision, the court wrote:

> [I]n many instances a plaintiff will be completely free of all responsibility for the accident, and yet, under the proposed abolition of joint and several liability, such a completely faultless plaintiff, rather than a wrongdoing defendant, would be forced to bear a portion of the loss if any one of the concurrent tortfeasors should prove financially unable to satisfy his proportioned share of the damages.

*Id.* at 905. However, the court softened the harshness to defendants of joint and several liability. It held that defendant could bring in other tortfeasors through cross-motions, meaning plaintiffs could not unilaterally decide whom to sue. *Id.* at 916-18. It also held that defendants could obtain "equitable indemnity" based on comparative fault. *Id.* at 907-12.

Eight years later, California voters approved Proposition 51, a measure which provided for the abolition of joint and several liability for non-economic damages but retained it for economic damages. Ellyn Moscowitz, *The Fair Responsibility Act of 1986: How Fair Is It?*, 13 Whittier L. Rev. 909, 909 (1992). In a case upholding the constitutionality of Proposition 51, the California Supreme Court described it as a compromise between an equitable division of liability and full compensation for the plaintiff:

> While recognizing the potential inequity in a rule which would require an injured plaintiff who may have sustained considerable medical expenses and other damages as a result of an accident to bear the full brunt of the loss if one of a number of tortfeasors should prove insolvent, the drafters of the initiative at the same time concluded that it was unfair in such a situation to require a tortfeasor who might only be minimally culpable to bear all of the plaintiff's damages. As a result, the drafters crafted a compromise solution: Proposition 51 retains the traditional joint and several liability doctrine with respect to a plaintiff's economic damages, but adopts a rule of several liability for noneconomic damages, providing that each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the injury.

*Evangelatos v. Superior Court*, 753 P.2d 585, 634 (Cal. 1988).

Indiana's law is also a modern compromise. In Indiana, the Comparative Fault Act took effect January 1, 1985. The act did not explicitly address joint and several liability; however, the jury instructions codified at Indiana Code § 34-51-2-8(b), *see*, *supra*, note 2, had the practical effect of abolishing it. Lawrence P. Wilkins, *The Indiana Comparative Fault Act at First (Lingering) Glance*, 17 Ind. L. Rev. 687, 703 (1984). "This was supposedly one of the 'bargaining chips' given up by the proponents in the political compromise necessary to obtain passage of the Act." *Id.*

Although the practical effects of abolishing joint and several liability had been felt for years, it was not until 2002 that the Indiana Supreme Court formally announced that it had indeed been abolished. *See Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 109 (Ind. 2002). The Indiana Supreme Court explained that the Act addressed two concerns: the harsh common law rule that prohibited a plaintiff from getting compensation even if he was slightly at fault and the harsh common law rule that a defendant who was even slightly at fault could be forced to pay all the damages. *Id.*

Thus, one can see the difficulty in determining which state's policy will be more impaired. This is not a case where one state's policy is antiquated or no longer of concern. Rather, each state made its own decision about which party ought to bear the risk of an unrecoverable portion of what California calls "non-economic damages." Indiana chose the plaintiff, California the solvent tortfeasor. Both of these policies were ratified by the Indiana legislature or the California people and upheld by those states' Supreme Courts in recent times.

California does consider the situs of the tort under the umbrella of the "function and purpose" of the laws. This analysis reveals that Indiana's policy would be more impaired if California's law were applied than vice versa. Although Plaintiffs urge the court to apply the law of their residence, all the relevant actions took place in Indiana. Two California cases are illustrative. In *Offshore Rental Co. v. Continental Oil Co.*, 583 P.2d 721, a California corporation sued a New York-based corporation for loss of services of a key employee who was negligently injured on the New York-based corporation's premises in Louisiana. Louisiana law would not have allowed for recovery; California law arguably would have (but only dicta supported that reading of the law). This was a true conflict because California was interested in a California corporation getting compensated and Louisiana was interested in a corporation doing business within its borders avoiding excessive liability. The court noted that the California law was outdated compared to the law of other states. In the court's words, it "constitutes a law 'archaic and isolated in the context of the laws of the federal union." *Id.* at 728.

Additionally, it noted that the important actions in the case took place within the borders of Louisiana:

> An examination of the function and purpose of the respective laws before us provides additional support for our limitation of the reach of California law in the present case. The accident in question occurred within Louisiana's borders; although the law of the place of the wrong is not necessarily the applicable law for all tort actions, the situs of the injury remains a relevant consideration. At the heart of Louisiana's denial of liability lies the vital interest in promoting freedom of investment and enterprise within Louisiana's borders, among investors incorporated both

-13-

> in Louisiana and elsewhere.  The imposition of liability on defendant, therefore, would strike at the essence of a compelling Louisiana law.

*Offshore*, 583 P.2d at 728.

Also, in *Cable v. Sahara Tahoe Corp.*, 155 Cal. Rptr. 770 (Cal. Ct. App. 1979), California applied Nevada law—denying liability for tavern keepers for injuries caused by intoxicated patrons—where the beverages were served in Nevada and the accident occurred in Nevada.  The plaintiff was a California citizen, although she arguably had moved in with her boyfriend in Nevada and had obtained a license there.  There was a true conflict in this case because Nevada had an interest in protecting its local businesses and California had an interest in compensating its citizens.  The court found that "the only factor which supports plaintiff's claim of California governmental interest in this case is her status as a California resident."  *Id.* at 778.  However, the court cited the passage from *Offshore* above to demonstrate that this was not a sufficient reason for applying California law.[4]

Like *Offshore*, California's only connection to this lawsuit is the residence of the plaintiffs and deceased.  All of the relevant actions took place in Indianapolis, Indiana.  Because all of the events in this case took place within the borders of Indiana, Indiana's interest will be more impaired.  The defendants are businesses licensed to do business in the state of Indiana.  Plaintiffs argue that *Offshore* is not applicable to the case at

---

[4] Like *Offshore*, there was an additional consideration demonstrating lack of commitment to the policy (California had subsequently repealed the statute giving rise to liability in the case) but the situs stood clearly as an independent justification.  *See Cable*, 155 Cal. Rptr. at 778.

hand because the law analyzed in *Offshore* was antiquated and had never been used to support a claim like the plaintiff in that case was arguing for. True, but the court in *Offshore* claimed that the situs was "an additional support." *Id.* This court takes that to mean that it is an independent justification for finding Indiana law applicable to this case. Like the plaintiff in *Offshore*, by entering Indiana, Flowers "'exposed [her]self to the risks of the territory' and [her parents] should not expect to subject defendant to a financial hazard that [Indiana] law had not created." *Offshore*, 583 P.2d at 728.

Therefore, Indiana's comparative fault scheme with its abolition of joint and several liability will apply to this case. The agreement between Cyrus and Plaintiffs, then, does not affect the potential liability of Defendants, who can be held liable only for damages up to their degree of fault. This makes a determination of good faith on the settlement irrelevant, therefore the motion is **DENIED** as moot.

### C. Motion for Partial Summary Judgment

The motion for partial summary judgment also presents a choice of law issue, which is a matter of law appropriate for summary judgment. *See Jaurequi v. John Deere Co.*, 986 F.2d 170, 171 (7th Cir. 1993). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn

therefrom, in the light reasonably most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).

Under the common law, there was no suit for wrongful death.  *See Horn v. Hendrickson*, 824 N.E.2d 690, 696 (Ind. Ct. App. 2005).  Wrongful death suits are, therefore, statutory creations and in Indiana wrongful death statutes are strictly construed.  *Southlake Limousine & Coach, Inc. v. Brock*, 578 N.E.2d 677, 679 (Ind. Ct. App. 1991).  Although Indiana has had a wrongful death statute since 1852, until 2000 there was no suit allowable under Indiana law for the wrongful death of an unmarried adult who, like Flowers, left no dependent children or next of kin.  Tammy J. Meyer & Kyle A. Lansberry, *Recent Developments in Indiana Tort Law*, 34 Ind. L. Rev. 1075, 1075, 1077-78 (2001).  Indiana Code § 34-23-1-2 now provides for a wrongful death action by the personal representative of an unmarried adult without any dependents.  This statute limits what type of damages can be recovered; for example, personal grief and punitive damages are not recoverable.  Ind. Code § 34-23-1-2(c)(2).  Also, damages for "[l]oss of the adult person's love and companionship" are limited to $300,000.  *See* Ind. Code § 34-23-1-2(e).

The Indiana courts have yet to interpret the legislature's policy behind limiting pecuniary damages in this way, but presumably, like the Missouri statute in *Reich v. Purcell* it is aimed at protecting defendants, "in that it operates to avoid the imposition of excessive financial burdens on them."  *Reich*, 432 P.2d at 731.  Unlike the site of the

accident in *Reich*, Indiana has an interest in having its policy applied in this case because the defendants are businesses whose Indiana operations—under Plaintiffs' theory—gave rise to this suit. Indiana, therefore, has an interest in avoiding the imposition of excessive financial burdens on Defendants in relationship to their business activities in the state.[5]

California's law differs from Indiana's in that it does not limit damages for the loss of love and companionship to $300,000. California Code of Civil Procedure § 377.61 states that "damages may be awarded that, under all the circumstances of the case, may be just . . . ." The purpose of this statute is to compensate heirs for the loss of companionship and other losses from the decedent's death. *Quiroz v. Seventh Ave. Ctr.*, 45 Cal. Rptr. 3d 222, 226 (Cal. Ct. App. 2006). Because the plaintiffs are residents of California, like Ohio in *Reich*, California has an interest in applying its law because of its interest "in affording full recovery to injured parties." *Reich*, 432 P.2d at 731. Therefore, a true conflict exists here also.

---

[5] Plaintiffs argue that Indiana does not have an interest in applying its law. They present two arguments. The first is that Southwest operates in California; thus, California has an interest in limiting Southwest's liability as well. This argument misunderstands the governmental interest analysis. Both Indiana and California might have the same policy considerations, but they have chosen very different ways of balancing those considerations. Indiana has an interest in its own balance being applied.

The second argument is that Southwest will not stop doing business in Indiana just because California's wrongful death statute is applied and therefore Indiana would better promote its economic interests by "contributing to a traveler's sense of security, not by shielding [Southwest] from the consequences of its wrongful conduct." (Pls.' Response 12.) Just because Plaintiffs disagree with the efficacy of Indiana's policy choices does not mean that Indiana does not have an interest in applying its laws. California's choice of law regime does not concern itself with which state's law is "better" or "worthier." *Offshore*, 583 P.2d at 726.

As above, Indiana's interests will be more impaired if California's law were applied than vice versa. Plaintiffs' daughter voluntarily traveled to Indiana and they should not be able to subject businesses that operate in Indiana to their state's laws when Indiana has a compelling interest in applying its own law to the action. Therefore, Defendant Southwest's motion is **GRANTED** and Plaintiffs will be limited to $300,000 damages for loss of love and companionship.

### III.   CONCLUSION

For the reasons set forth above, Indiana law will apply to both issues raised by the parties. Therefore, liability will not be joint, meaning Plaintiff's motion for determination of good faith settlement will be **DENIED** as moot. Also, Defendant's motion for partial summary judgment will be **GRANTED**, meaning that Indiana law will apply to the wrongful death suit and damages for loss of love and companionship will be limited to $300,000.

ALL OF WHICH IS ENTERED this 10th day of January 2007.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge William T. Lawrence

Matthew Mark Adolay
WOODEN & MCLAUGHLIN LLP
madolay@woodmaclaw.com

Alicia Kathleen Berry
HOLLINS SCHECHTER
aberry@hollins-law.com

Kathleen M. K. Carter
HOLLINS SCHECHTER
kcarter@hollins-law.com

Mark W. Eisenberg
HOLLINS SCHECHTER
1851 East First Street
6th Floor
Santa Ana, CA 92705-4017

Jerome A. Kaplan
KAPLAN KENEGOS & KADIN
kapkenkd@pacbell.net

Joan E. Kenegos
KAPLAN KENEGOS & KADIN
jeklaw@pacbell.net

John D. Nell
WOODEN & MCLAUGHLIN LLP
jnell@woodmaclaw.com

John D. Papageorge
SOMMER BARNARD ATTORNEYS, PC
jpapageorge@sommerbarnard.com